UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF OHIO
WESTERN DIVISION

JAMES L. LAWSON,

                Petitioner

        v.                                  C-1-03-17

WANZA JACKSON,

                Respondent

## ORDER

This matter was referred pursuant to 28 U.S.C. § 636 to the United States Magistrate Judge for consideration and report on the Petition for Writ of Habeas Corpus filed by the petitioner pursuant to 28 U.S.C. § 2254.  The matter is before the Court upon the Report and Recommendation of the Magistrate Judge (doc. no. 10) recommending that the Petition for Writ of Habeas Corpus be dismissed and upon petitioner's objections thereto (doc. no. 11).

## REPORT AND RECOMMENDATION

Petitioner, a prisoner in state custody at the Warren Correctional Institution in Lebanon, Ohio, brings this action pro se for a writ of habeas corpus pursuant to 28 U.S.C. § 2254.  This matter is before the Court on the petition, respondent's return of writ, petitioner's "traverse" in reply to the return of writ, and respondent's "response" to petitioner's traverse, as well as the transcript of the challenged state criminal proceedings.  (*See* docs. 1, 4, 5, 8, 9).

2

## Factual And Procedural Background

On December 9, 1998, petitioner was indicted by the Butler County, Ohio, grand jury on one count of murder as defined in Ohio Rev. Code § 2903.02(A), one count of gross abuse of a corpse as defined in Ohio Rev. Code § 2927.01(B), and one count of tampering with evidence as defined in Ohio Rev. Code § 2921.12(A)(1). (*See* doc. 4, Ex. A). Prior to trial, petitioner's counsel filed a motion for change of venue due to extensive pretrial publicity, which was overruled "subject to *voir dire* examination" of potential jurors. (*Id.,* Exs. B, D).

Petitioner initially entered a plea of not guilty by reason of insanity, but was found competent to stand trial. (*Id.,* Exs. E, F). Thereafter, on November 7, 1999, petitioner entered a plea of no contest to the charges of gross abuse of a corpse and tampering with evidence. (*Id.,* Ex. G). After a trial before a jury on the remaining murder charge, petitioner was found guilty as charged. (*See id.,* Ex. H). On December 15, 1999, petitioner was sentenced to a term of imprisonment of fifteen (15) years to life for the murder offense; petitioner also was sentenced to a one (1) year prison term for the gross abuse of a corpse offense, to be served concurrently with the sentence for murder, and a five (5) year prison term for the tampering with evidence offense, to be served consecutively to the sentence imposed for murder. (*Id.*).

3

With the assistance of counsel, petitioner filed a direct appeal to the Ohio Court of Appeals, Twelfth Appellate District, raising eight assignments of error. (*Id.,* Ex. I). On April 30, 2001, the Court of Appeals affirmed the trial court's judgment. (*Id.,* Ex. K). In its Opinion, the court made findings of fact, which are presumed correct under 28 U.S.C. § 2254(e)(1),[1] regarding the incident leading to petitioner's arrest and ultimate conviction and sentence:

> On April 13, 1998, two bike riders discovered a human torso on the east bank of the Great Miami River in Hamilton, Ohio. The torso was found without a head, arms or legs. The Butler County Sheriff's office and the Butler County Coroner responded to the scene and began an investigation. An autopsy was performed, and with the aid of Dr. Elizabeth Murray, a forensic anthropologist, it was determined that the remains were of a Caucasian female, approximately twenty-five to thirty years old and approximately five-feet-six inches to six-feet-one inch in height. Dr. Murray estimated that the death occurred weeks to a few months before the remains were discovered.
>
> Dr. Murray removed the ends of the long bones from the torso and sent them to the Memphis Crime Lab for a tool mark analysis. Dr. Steven Symes, a specialist in tool mark analysis, determined that the cuts on the bones indicated that the arms, legs and head of the torso had been severed with a power circular saw or a skill saw.

---

[1] 28 U.S.C. § 2254(e)(1) provides that "[i]n a proceeding instituted by an application for a writ of habeas corpus by a person in custody pursuant to the judgment of a State court, a determination of a factual issue made by a State court shall be presumed correct" unless petitioner rebuts the presumption by "clear and convincing evidence." Petitioner has neither cited nor presented any evidence to rebut the Ohio court's factual findings quoted herein. Therefore, petitioner has not demonstrated by clear and convincing evidence that such findings are erroneous.

4

Major Anthony Dwyer of the Butler County Sheriff's office was in charge of the police investigation. He sent a teletype to surrounding agencies requesting any information they might have on missing persons meeting the description of the victim. The Middletown Police Department responded to Dwyer's request with information that they had a report on a missing person matching the general description of the victim. They informed Dwyer that on March 20, 1998, Karla Edwards reported her sister, Cheryl Durkin ("Durkin"), missing. DNA analysis comparing tissue from the torso to a blood sample from Durkin's mother confirmed that the victim was Durkin.

The police interviewed Durkin's family and friends to begin their investigation. When police learned that Durkin was working as a prostitute in the area of Central Avenue and Garfield Street in Middletown, they began to focus their efforts there. They determined that Durkin had been last seen in that area in late February and that she often placed phone calls to an acquaintance from a pay phone on Central Avenue. Phone records revealed that the last date a phone call was placed from the pay phone to the acquaintance was on February 24, 1998.

Based on their interviews with people in the area and on phone calls, the police began to focus their investigation on Lawson. They searched his mother's garage with her consent on May 27, 1998. As the result of an anonymous phone call, the police executed a search warrant on Lawson's residence on June 5, 1998. While conducting the search warrant, the police found a substance that tested positive for blood. They also discovered that the basement had been painted recently and that the carpeting upstairs had been ripped out. The blood specimens were sent for DNA analysis. Samples from three of the blood spots in Lawson's home were later determined to consist of Durkin's blood.

While police were searching the residence, Dwyer asked Lawson if he would come to the police station to answer some questions. Lawson agreed and was questioned at the station by Dwyer. [Lawson] denied knowing Durkin, denied having any information about the torso in the river other than what he read in the paper and denied having power tools in the house. He also denied ever using drugs or paying for the services of a prostitute. When information came to Dwyer that the officers in Lawson's home found substances that tested positive for blood, Lawson stated that it was his and could not be Durkin's

5

because he did not know her and she had never been in his home. Lawson also stated that he painted the living room and basement about two weeks ago with paint he had sitting around the house that was leftover from a job several years ago.  After several hours of questioning, Lawson told Dwyer that he was tired and the police honored his request to leave.

On August 31, 1998, Lawson's sister met with Dwyer and revealed that she and her mother had disposed of body parts in early June. She led police to a site in the Rush Run Recreational area in Preble County, Ohio where a skull, a right leg and two feet were recovered. She also led police to an area  near Brookville Lake, Indiana where a left leg and both arms, cut into two pieces each, were recovered.  The body parts were determined to be Durkin's.  Based on the exhumed remains, the cause of death was determined to be cranial cerebral trauma inflicted by at least four blows to the head with a blunt instrument.

Police obtained a warrant for Lawson's arrest, but were unable to locate him.  They recovered a letter from his mother's house indicating he was in California.  On November 27, 1998 police received a phone call with a potential lead on Lawson's whereabouts. Aleda Funk called police with information that she had a videotape of a Thanksgiving dinner at her home and that the tape contained footage of Lawson.  The police drove to Funk's house in Indiana and viewed a videotape in which Lawson was a guest at Funk's family Thanksgiving dinner.

Lawson came to the Thanksgiving dinner with Funk's granddaughter, Billy Jenks ("Jenks"), who lived in Carrolton, Kentucky. According to Jenks, when she met Lawson in July 1998, he told her his name was David Wallace and that he had just been discharged from the army. The two began living together shortly after meeting and over time, Lawson began to tell Jenks that he was not who he had initially claimed to be.

Shortly before Thanksgiving, Lawson told Jenks that he was wanted for murder in Butler County.  According to the story Lawson told Jenks, he had been doing drugs and came home to find a person he did not know bent over his safe.  Lawson told Jenks that he hit the person with a tool on the back of the head and that she "dropped like a fly."  Lawson drug the body downstairs, then went back upstairs and

6

went to sleep. Lawson said that in the morning, when he woke up, he realized the encounter wasn't a dream, and knew he had to get rid of the body. Lawson told Jenks that he cut the body up in his basement, raked the back yard and put the body parts in trash bags with the leaves. He told Jenks that he later took the torso and threw it off a bridge.

After receiving information from Funk that Lawson was living with Jenks, the police arrested Lawson at Jenk's home in Carrolton, Kentucky. Jenks cooperated with police in Lawson's arrest and gave consent for police to search her home and the vehicles in the driveway. During the search, police recovered a plastic baggie with several different types of false identification containing Lawson's picture.

(*Id.,* pp. 1–6).

With the assistance of new counsel, petitioner sought leave to appeal to the Ohio Supreme Court. In his memorandum in support of jurisdiction, petitioner presented four propositions of law wherein he raised for the first time the following two claims of constitutional error occurring at trial:

**Proposition of Law No. 2:** The withholding of witness statements by the Prosecution after timely request by the Defendant, where such witness statements are inconsistent with that witness's testimony at trial, where such statements are favorable to the Defendant and where such evidence is material either to guilt or punishment, is a violation of due process.

**Proposition of Law No. 3:** Continuous and pervasive publicity of a murder case in a local community requires a change of venue in order to guarantee the accused a fair and impartial jury.

7

(*Id.,* Ex. L). In the body of the memorandum, petitioner further argued that if the court were to find the two new claims were not "sufficiently preserved" for review, it should consider them "under a claim of ineffective assistance of appellate counsel." (*Id.,* pp. 7, 11). On September 5, 2001, the Ohio Supreme Court denied petitioner leave to appeal and dismissed the appeal "as not involving any substantial constitutional question." (*Id.,* Ex. N).

The instant petition, which was signed by petitioner on November 27, 2002, was stamped as "filed" on January 8, 2003. (*See* doc. 1). In the petition, petitioner presents three grounds for relief:

> 1. In paragraphs 7–12 of the petition, which this Court designates as Ground One, petitioner alleges he was denied due process when, in violation of *Brady v. Maryland,* 373 U.S. 83 (1963), the State withheld a prior statement made by State witness Billy Jenks in the grand jury proceedings which was inconsistent with her trial testimony.
>
> 2. In paragraphs 13–16 of the petition, which this Court designates as Ground Two, petitioner alleges that he was denied his due process right to a fair and impartial jury trial when the trial court denied his motion for change of venue due to extensive pretrial publicity.
>
> 3. In paragraph 17 of the petition, which this Court designates as Ground Three, petitioner alleges he was denied effective assistance by his state appellate counsel based on his attorney's failure to assert the claims alleged in Grounds One and Two as assignments of error on direct appeal.

(*Id.*).

8

As respondent apparently concedes (*see* Doc. 9), the petition is not barred from review on statute of limitations grounds.[2]  Moreover, it appears that petitioner has exhausted his state court remedies with respect to his grounds for relief.  In the return of writ, respondent contends that petitioner has waived the claims alleged in the first two grounds for relief because of his procedural default in failing to assert them as assignments of error on direct appeal.  (Doc. 4, Brief, pp. 12–13).  However, because petitioner has argued as "cause" for his default and as an independent ground for relief that his appellate counsel was ineffective in failing to raise the claims on direct appeal, the Court must examine the underlying merits of these otherwise "waived" claims to determine whether there is merit to petitioner's un–waived ineffective assistance of appellate counsel claim. Therefore, under the particular circumstances presented by this case, the Court will assume without deciding that petitioner has not waived his first two grounds for relief and will proceed to address each of his claims on the merits.

---

[2]Respondent initially asserted a statute of limitations defense.  (***See*** Doc. 4, Brief, p. 10). However, as petitioner pointed out in his "traverse" brief, he is a pro se litigant who timely "filed" his petition by signing and submitting it to prison authorities for mailing on November 27, 2002, "one (1) full week before the expiration of the one-year limitations period" on December 4, 2002.  (Doc. 8, p. 2)**.  *See, e.g., Jones v. Bertrand*,** 171 F.3d 499, 502 (7th Cir. 1999); ***Nichols v. Bowersox***, 172 F.3d 1068, 1077 (8th Cir. 1999); ***Spotville v. Cain,*** 149 F.3d 374, 376-77 (5th Cir. 1998); ***Burns v. Morton***, 134 F.3d 109, 112-13 (3rd Cir. 1998); **see also *In re Sims***, 111 F.3d 45, 47 (6th Cir. 1997). In response, respondent has agreed that upon review of prison records, the petition was "timely delivered to the prison mailroom" and thus is not time-barred.  (Doc. 9).  ***Cf. Burnett v. Birkett***, No. 00-10144-BC, 2002 WL 31748843, at *3 (E.D. Mich. Nov. 26, 2002) (unpublished) (citing ***Hudson v. Martin,*** 68 F.Supp.2d 798, 799 n.2 (E.D. Mich. 1999), ***aff'd,*** 8 Fed. Appx. 352 (6th Cir. Mar. 22, 2001)).

9

10

**OPINION**

**A. Petitioner's Allegations In Ground One Of A *Brady* Violation Lack Merit**

In Ground One of the petition, petitioner contends he was denied due process when the State improperly withheld material evidence that was favorable to the defense in violation of ***Brady v. Maryland***, 373 U.S. 83 (1963).  (Doc. 1, ¶¶ 7–12).

This claim arises from the following colloquy that occurred during the trial testimony of petitioner's girlfriend, Billy Jenks, regarding her prior testimony before the grand jury:

> Q.  Now, you came to Ohio pursuant to legal process in December of 1998:
>
> A.  Yes.
>
> Q.  And do you recall what purpose that was for?
>
> A.  To testify.
>
> Q.  Okay.  And you testified under oath before a Grand Jury?
>
> A.  Yes.
>
> Q.  And when you testified under oath in December of 1998 were you completely honest with that Grand Jury?
>
> A.  Not completely.
>
> Q.  And why were you not completely honest?

(Doc. 5, Tr. 685).

11

At that point, defense counsel objected to the line of questioning, and a sidebar discussion was held out of the hearing of the jurors. During this discussion, the prosecutor stated that he was trying to elicit an explanation from Jenks prior to her cross-examination by defense counsel as to why she "did not tell the entire truth the first time she testified in this matter." (*Id.,* Tr. 686). Defense counsel stated in response that he did not possess "any statements from [Jenks]" and did not know what the prosecutor was "talking about." (*Id.*). The prosecutor replied: "That's true, Your Honor. We're not required to disclose those statements in advance of trial[,] . . . unless pursuant to Rule 16 it's required." (*Id.*). Defense counsel then asked the prosecutor to tell him "what [Jenks] said" to the grand jury and that "just maybe I won't object." (*Id.,* Tr. 686–87). The prosecutor replied:

> . . . . Um, she just didn't tell the whole story. She told everything about hitting [the victim] in the head and all that. There's just things she didn't tell about. How well she knew him and –

(*Id.,* Tr. 687). Defense counsel interrupted the prosecutor at that point, stating that "I'm not going to break it up," and "I just didn't know what he [the prosecutor] was talking about." (*Id.*). It appeared then that defense counsel had withdrawn his objection, and the sidebar conference concluded. (*See id.*).

The prosecutor resumed his direct examination of Jenks before the jury, which continued as follows:

> Q. And you testified before a Grand Jury in December 1998 under oath?
>
> A. Yes.

12

Q.  And you indicated that you did not tell the entire truth?

A.  Yes.

Q.  And, uh, why?

A.  (UNCLEAR) the reasons?

Q.  Yeah.  Well give us the reasons.

(*Id.,* Tr. 687–88).

At that point in the questioning, defense counsel interjected the "same objection," and another sidebar conference was held out of the jurors' hearing. (*Id.,* Tr. 688).  Defense counsel indicated that he objected to the prosecutor's probing into the reasons behind Jenks' "inconsistent" testimony before the grand jury.  When the trial judge inquired whether Jenks' testimony was part of the grand jury record that he had read, the prosecutor responded:

> You got it all.  That's what I'm saying.  It's not major inconsistencies. It's just she didn't tell the whole story.  Um, there was, I mean she talked about him [Lawson] hitting her [the victim] in the head and all that.  It's just a matter of, uh, you know, ––

(*Id.,* Tr. 689).  Defense counsel interrupted the prosecutor, stating as he did in the initial sidebar conference, "I'm not going into it."  (*Id.*).  The sidebar discussion thereupon ended, and the prosecutor concluded his examination of Jenks as follows about her grand jury testimony without pursuing the area of inquiry that had been objected to by defense counsel:

> Q.  The story you told the original Grand Jury was substantially the same though as you told today was it not?

13

A.  Yes.

(*Id*.).

When the prosecutor completed Jenks' direct examination, the trial judge asked counsel to approach the bench for a final sidebar discussion about Jenks' statements before the grand jury.  (*Id.,* Tr. 690).  The judge stated that he had listened to Jenks' grand jury testimony "on tape," which he found was "essentially the same," and indicated that he would allow defense counsel the opportunity to hear the testimony.  (*Id.,* Tr. 690–91).  The prosecutor  responded as follows:

> Well, now wait a minute.  That's okay, but I just stopped my questioning because he [defense counsel] said he was not going to go into that.  I mean it's essentially the same as far as hitting [the victim] in the head.  I stopped  my questioning based on the representation that he [defense counsel] wasn't going to go into that.

(*Id.,* Tr. 691).

Defense counsel then indicated to the court that it was unnecessary for him to hear Jenks' grand jury testimony "if the inconsistency is simply upon how well she [Jenks] knew him [Lawson]," because that was not "probative of any area I want to go to." (*Id*.).  Defense counsel stated further: "If there's something else there that you–that's inconsistent with what she said other than their relationship, well maybe they should tell me." (*Id*.).  When the prosecutor pointed out that one other "major inconsistency" in Jenks' grand jury testimony was that she "didn't say anything about how he [Lawson] disposed of the body," defense counsel responded that he did "not intend to go there either." (*Id.,* Tr. 691–92).  After a

14

few more inaudible, indecipherable remarks by the trial judge and counsel for both parties, the bench conference concluded.  (*Id.,* Tr. 692).

Petitioner now essentially contends that the prosecutor improperly withheld Jenks' grand jury testimony from the defense at trial.  (*See* doc. 1, ¶¶ 8-12).  The Supreme Court ruled in *Brady* that the prosecution is required under the Fourteenth Amendment's Due Process Clause to disclose evidence in its possession that is both favorable to the accused and material to guilt or punishment. *Brady,* 373 U.S. at 87; *see also United States v. Bagley,* 473 U.S. 667, 674 (1985).  *Brady* did not create a broad constitutional right of discovery in a criminal case, but rather is premised on "the avoidance of an unfair trial to the accused," *Brady,* 373 U.S. at 87.  *Bagley,* 473 U.S. at 675 & n.6-7.  Therefore, "the prosecutor is not required to deliver his entire file to defense counsel, but only to disclose evidence favorable to the accused that, if suppressed, would deprive the defendant of a fair trial."  *Id.* at 675.

To establish a *Brady* violation, it must be shown that (1) the prosecution suppressed evidence; (2) the evidence was favorable to the accused; and (3) the suppressed evidence was material to guilt or punishment, "irrespective of the good faith or bad faith of the prosecution."  *Moore v. Illinois,* 408 U.S. 786, 794-95 (1972); s*ee also Brady,* 373 U.S. at 87; *Bowling v. Parker,* 138 F.Supp.2d 821, 880 (E.D. Ky. 2001), *aff'd,* 344 F.3d 487 (6th Cir. 2003), *cert. denied,* 125 S.Ct. 281 (2004.  Evidence is deemed "material" under *Brady* "only if there is a reasonable

15

probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different." *Bagley,* 473 U.S. at 682. "A 'reasonable probability' is a probability sufficient to undermine confidence in the outcome" of the trial. *Id.* "The mere possibility that an item of undisclosed information might have helped the defense, or might have affected the outcome of the trial, does not establish 'materiality' in the constitutional sense." *United States v. Agurs,* 427 U.S. 97, 109–10 (1976). This standard for determining materiality focuses on the defendant's guilt or innocence, rather than on the impact of the undisclosed evidence on the defendant's ability to prepare for trial. *United States v. Phillip,* 948 F.2d 241, 249 (6th Cir. 1991) (citing *Agurs,* 427 U.S. at 112 n.20), *cert. denied,* 504 U.S. 930 (1992).

Impeachment evidence, as well as exculpatory evidence, falls within the *Brady* rule. *Bagley,* 473 U.S. at 676. Impeachment evidence is considered "evidence favorable to the accused" because the jury's assessment of the reliability and truthfulness of a given witness may well be determinative of the defendant's guilt or innocence. *Id.*; *see also Giglio v. United States,* 405 U.S. 150, 153 (1972). On the other hand, evidence that tends to inculpate the defendant or that is neither facially exculpatory nor impeaching does not fall under *Brady*'s proscription. *United States v. Simpson,* 901 F.2d 1223, 1228 (5th Cir. 1990); *United States v. Comosona,* 848 F.2d 1110, 1115 (10th Cir. 1988); *cf. Agurs,* 427 U.S. at 112 n.20; *Phillip,* 948 F.2d at 250.

16

The *Brady* principles apply only to a complete failure to disclose exculpatory information. *United States v. Word*, 806 F.2d 658, 665 (6th Cir. 1986), *cert. denied* 480 U.S. 922 (1987); *United States v. Holloway*, 740 F.2d 1373, 1381 (6th Cir.), *cert. denied*, 469 U. S. 1021 (1984). Tardy disclosures of exculpatory evidence do not violate *Brady* unless the defendant has been prejudiced by the delay in disclosure. *Id.* If the disclosure is made "in time for full and adequate correction," no prejudice to the defense occurs. *Holloway*, 740 F.2d at 1381 (quoting *United States v. Enright*, 579 F.2d 980, 989 (6th Cir. 1978)).

As an initial matter, it appears that Jenks' grand jury statements were subject to disclosure by the prosecution only under the procedure set forth in Ohio R. Crim. P. 16(B)(1)(g), which provides in relevant part:

> Upon completion of a witness' direct examination at trial, the court on motion of the defendant shall conduct an in camera inspection of the witness' written or recorded statement with the defense attorney and prosecuting attorney present and participating, to determine the existence of inconsistencies, if any, between the testimony of such witness and the prior statement.
>
> If the court determines that inconsistencies exist, the statement shall be given to the defense attorney for use in cross-examination of the witness as to the inconsistencies.
>
> If the court determines that inconsistencies do not exist the statement shall not be given to the defense attorney and he shall not be permitted to cross-examine or comment thereon.

17

It appears from the record that the procedure set forth in Rule 16(B)(1)(g) was properly followed in this case.[3]  It further appears that although the trial judge found upon review of Jenks' grand jury statements that her grand jury and trial testimonies were "essentially the same," petitioner's trial counsel was allowed access to Jenks' grand jury testimony for use in cross–examination.  Petitioner's counsel chose, however, not to exercise that opportunity, because the "inconsistencies" in Jenks' prior testimony were not areas that he wanted to pursue as part of the defense strategy.

Petitioner thus has not shown, as required under **_Brady,_** that the State withheld any statements contained in Jenks' grand jury testimony from him.  In any event, it is clear from the record that the purported "inconsistencies" pertained only to Jenks' relationship with petitioner and statements made by petitioner to Jenks about the disposal of the victim's body.  Assuming, without deciding, that these "inconsistencies" constituted evidence favorable to the defense, they were not "material."  It appears on review of Jenks' cross–examination at trial that it was

---

[3] **_See, e.g., State v. Boyce_**, No. 98-CA-95, 1999 WL 959180, at *3 (Ohio Ct. App. Aug. 6, 1999) (unpublished); **_see also State v. Buhrman_**, No. 96 CA 145, 1997 WL 566154, at *8-9 (Ohio Ct. App. Sept. 12, 1997) (unpublished) ("With the exception of [Ohio R. Crim. P. 16(B)(1)(g)], witness statements are not discoverable under Criminal Rule 16."), **_appeal dismissed_**, 687 N.E.2d 473 (Ohio 1997).  **_Cf. State v. Scudder_**, 643 N.E.2d 524, 531 (Ohio 1994) (defendant was not entitled to "_pretrial_ release of [witness] statements under Crim.R. 16(B)(1)(g), which governs the procedure for release of a witness's inconsistent prior written or recorded statements _after_ the witness has testified on direct examination at trial"), **_cert. denied_**, 515 U.S. 1164 (1995); **_State v. Lane_**, 358 N.E.2d 1081, 1088 (Ohio 1976) ("Where a prosecution witness is not a co-defendant, a trial court does not err in refusing to compel discovery of prior statements and grand jury testimony given by said witness."), **_vacated on other grounds_**, 438 U.S. 911 (1978); **_State v. Stidham_**, No. 9-106, 1982 WL 5745, at *3 (Ohio Ct. App. Dec. 30, 1982) (unpublished) (affirming denial of motion under Ohio R. Crim. P. 16(B)(1)(c) for disclosure of prospective prosecution witness statement).

18

not part of the defense strategy to impeach Jenks' credibility, but rather to use her testimony as evidence demonstrating petitioner's innocence on the murder charge. (*See* Doc. 5, Tr. 694–705, 710).  Moreover, most importantly, as the prosecutor emphasized more than once, Jenks' grand jury and trial testimonies were consistent on the critical point of petitioner's statements to her about his killing the victim by hitting her in the head with a tool.  In contrast, the inconsistencies contained in Jenks' grand jury testimony related to minor issues not directly relevant to the murder count, which was the only charge before the jury after petitioner's plea of no contest to the gross abuse of a corpse and tampering with evidence charges.  Such evidence, therefore, would have had little if any impact on the jury's assessment of petitioner's guilt or innocence on the murder charge before it.

Accordingly, this Court concludes there is no merit to petitioner's claim of a *Brady* violation under the allegations set forth in Ground One of the petition.

**B. Petitioner Has Not Demonstrated That He Was Denied A Fair And Impartial Jury Trial Due To Extensive Pretrial Publicity As Alleged In Ground Two**

In Ground Two of the petition, petitioner contends he was denied his constitutional right to a fair and impartial jury trial as a result of the trial court's refusal to grant a change of venue due to extensive pretrial publicity.  (Doc. 1, ¶¶ 13–16).

The Sixth Amendment guarantees that "[i]n all criminal prosecutions, the accused shall enjoy the right to a . . . trial, by an impartial jury."  The right, held applicable to the states through the Fourteenth Amendment's Due Process Clause, requires that a defendant be provided a fair trial by a panel of impartial, "indifferent" jurors whose verdict is based on the evidence developed at trial.  *Irvin v. Dowd,* 366 U.S. 717, 722 (1961).  The right does not mandate a new trial every time a juror has been placed in a potentially compromising situation or that jurors be totally ignorant of the facts and issues involved as "it is virtually impossible to shield jurors from every contact or influence that might theoretically affect their vote." *Smith v. Phillips,* 455 U.S. 209, 217 (1982); *see also Murphy v. Florida,* 421 U.S. 794, 800 (1975).  The constitutional requirement of impartiality is satisfied if the jury is "capable and willing to decide the case solely on the evidence before it." *Smith,* 455 U.S. at 217.

The Supreme Court has established two standards–the "actual prejudice" standard and the "presumed prejudice" standard–to guide courts considering the issue whether a change of venue is necessary to ensure an impartial jury as required by the Constitution.  *See Nevers v. Killinger,* 169 F.3d 352, 362 (6th Cir.), *cert. denied,* 527 U.S. 1004 (1999).[4]  Under the "presumed prejudice" standard, extensive adverse pretrial publicity amounting to a "huge wave . . . of public

---

[4]The Sixth Circuit later abrogated **Nevers**, but only to the extent the court employed a subjective inquiry rejected by the Supreme Court in **Williams v. Taylor**, 529 U.S. 362, 409-10 (2000), in assessing the reasonableness of the state court's application of clearly established federal law. **See Harris v. Stovall**, 212 F.3d 940, 942-43 (6th Cir. 2000), **cert. denied**, 532 U.S. 947 (2001).

20

passion" can create such a presumption of prejudice in a community that jurors'
assurances of their impartiality should not be believed. *Mu'Min v. Virginia*, 500
U.S. 415, 429 (1991); *see also Patton v. Yount*, 467 U.S. 1025, 1031, 1333 (1984)
(quoting *Irvin*, 366 U.S. at 728); *Murphy*, 421 U.S. at 798-99. The cases where the
Supreme Court has presumed prejudice in the face of juror attestation to the
contrary are few and, indeed, "can only be termed extraordinary." *DeLisle v.
Rivers*, 161 F.3d 370, 382 (6th Cir. 1998) (en banc) (citing *Murphy*, 421 U.S. at 798-
99), *cert. denied*, 526 U.S. 1075 (1999). "[E]xtensive knowledge in the community
of either the crimes or the putative criminal is not sufficient by itself" to create
such a presumption. *Dobbert v. Florida*, 432 U.S. 282, 303 (1977); *see also
Murphy*, 421 U.S. at 799; *DeLisle*, 161 F.3d at 382 ("it is beyond question that
mere knowledge of the existence of the case, or familiarity with the issues
involved, or even some preexisting opinion as to the merits, does not in and of
itself raise a presumption of jury taint").

The "presumed prejudice" category of cases is represented by *Rideau v.
Louisiana*, 373 U.S. 723 (1963); *Estes v. Texas*, 381 U.S. 532 (1965); and *Sheppard
v. Maxwell*, 384 U.S. 333 (1966). *See Nevers*, 169 F.3d at 362; *see also Murphy*,
421 U.S. at 798-99; *Ritchie v. Rogers*, 313 F.3d 948, 952 (6th Cir. 2002), *cert.
denied*, 540 U.S. 842 (2003). In those cases, the influence of the news media,
either in the community at large or the courtroom itself, was found to have
"pervaded the proceedings." *Murphy*, 421 U.S. at 799. As the Court in *Murphy*
explained in examining the specific facts of those cases:

In *Rideau,* the defendant had "confessed" under police interrogation to the murder of which he stood convicted.  A 20–minute film of his confession was broadcast three times by a television station in the community where the crime and the trial took place.  In reversing, the Court did not examine the *voir dire* for evidence of actual prejudice because it considered the trial under review "but a hollow formality"–the real trial had occurred when tens of thousands of people, in a community of 150,000, had seen and heard the defendant admit his guilt before the cameras.

The trial in *Estes* had been conducted in a circus atmosphere, due in large part to the intrusions of the press, which was allowed to sit within the bar of the court and to overrun it with television equipment.  Similarly, *Sheppard* arose from a trial infected not only by a background of extremely inflammatory publicity but also by a courthouse given over to accommodate the public appetite for carnival.  The proceedings in these cases were entirely lacking in the solemnity and sobriety to which a defendant is entitled in a system that subscribes to any notion of fairness and rejects the verdict of a mob.

*Id.*; *see also Nevers*, 169 F.3d at 362–63.  The Sixth Circuit observed in *Nevers*: "Since *Murphy*, the Supreme Court has not applied the 'trial setting inherently prejudicial' standard of *Rideau, Estes,* and *Sheppard*, presumably because the 'televised interrogation/confession in a smaller community' and the 'tabloid-esque, carnival atmosphere' instances have not arisen.  We think that the holdings in those cases are limited to their facts."  *Nevers*, 169 F.3d at 363.

In the second category of cases, where there is no evidence of a "trial atmosphere . . . utterly corrupted by press coverage" as found in *Rideau, Estes,* and *Sheppard*, the Court must utilize the "actual prejudice" standard and examine the totality of the circumstances to determine whether the accused was deprived of a fair and impartial jury by pretrial publicity.  *Dobbert*, 432 U.S. at 303; *Murphy*,

22

421 U.S. at 799; *see also Irvin*, 366 U.S. at 723. Under the "actual prejudice" standard, "pretrial publicity that would inherently prejudice the jury pool can be discerned only by reviewing both the extent and nature of the publicity *and* the responses of the prospective jurors in voir dire." *Nevers,* 169 F.3d at 363 (citing *Irvin*) (emphasis in original). Although under this standard the jurors' assurances that they would remain impartial are not dispositive of the issue, the defendant must make some showing from which actual juror bias or prejudice may be inferred to raise the presumption of partiality. *See Murphy*, 421 U.S. at 800; *see also Smith*, 455 U.S. at 215–17; *Irvin,* 366 U.S. at 723.

In a highly publicized case that does not involve "presumed prejudice," a "searching voir dire of the prospective jurors is the primary tool to determine if the impact of publicity rises to [the] level" of actual prejudice. *Ritchie*, 313 F.3d at 962. Indeed, the Supreme Court has held that "part of the guarantee of a defendant's right to an impartial jury is an adequate voir dire to identify unqualified jurors." *Morgan v. Illinois*, 504 U.S. 719, 729 (1992). "Without an adequate voir dire the trial judge's responsibility to remove prospective jurors who will not be able impartially to follow the court's instructions and evaluate the evidence cannot be fulfilled." *Id.* at 729–30 (quoting *Rosales–Lopez v. United States*, 451 U.S. 182, 188 (1981) (plurality opinion)). A court's restrictions on voir dire inquiries are thus "subject to the essential demands of fairness." *Id.* at 730 (quoting *Aldridge v. United States*, 283 U.S. 308, 310 (1931)); *cf. Mu'Min,* 500 U.S.

23

at 425–26 ("To be constitutionally compelled, . . . it is not enough that questions [about the content of the publicity to which jurors have been exposed] might be helpful [in assessing juror impartiality].  Rather, the trial court's failure to ask these questions must render the defendant's trial fundamentally unfair.").

However, by the same token, "the adequacy of voir dire is not easily the subject of appellate review." *Rosales–Lopez,* 451 U.S. at 188.  At this stage of the trial, the trial court must determine the impartiality and credibility of the potential jurors by relying on its "own evaluations of demeanor evidence and of responses to questions." *Id.*  On appellate review, it is difficult to "second–guess" the conclusions of the judge who actually heard and observed the prospective jurors. *Id.*  In light of these concerns, the Supreme Court has stressed that the trial court must be accorded "wide discretion . . . in conducting voir dire in the area of pretrial publicity and in other areas of inquiry that might tend to show juror bias." *Mu'Min,* 500 U.S. at 427; *see also Rosales–Lopez,* 451 U.S. at 189 ("Because the obligation to impanel an impartial jury lies in the first instance with the trial judge, and because he must rely largely on his immediate perceptions, [trial] judges have been accorded ample discretion in determining how best to conduct the voir dire.").  The Supreme Court reasoned further in *Mu'Min*:

> Particularly with respect to pretrial publicity, we think this primary reliance on the judgment of the trial court makes good sense.  The judge of that court sits in the locale where the publicity is said to have had its effect and brings to his evaluation of any such claim his own perception of the depth and extent of news stories that might influence a juror.  The trial court, of course, does not impute his own

> perceptions to the jurors who are being examined, but these perceptions should be of assistance to it in deciding how detailed an inquiry to make of the members of the jury venire.

*Mu'Min*, 500 U.S. at 427.  In *Mu'Min*, which involved a highly publicized case, the Supreme Court found no constitutional error in the trial court's denial of individual voir dire or its refusal to allow prospective jurors to be questioned about the specific contents of news reports.  *See id.* at 431–32 (stating that in prior cases requiring the subject of possible racial bias to be "covered" in voir dire, "we have been careful not to specify the particulars by which this could be done" and, more specifically, that "[w]e did not, for instance, require questioning of individual jurors about facts or experiences that might have led to racial bias"); *see also Ritchie*, 313 F.3d at 961–62 & n.13.

In addition, on federal habeas corpus review of a state conviction, this Court's review is further limited to the extent the trial judge's determination of juror impartiality is a finding of fact entitled to the presumption of correctness under 28 U.S.C. § 2254(e)(1).  *See supra* p. 2 n.1; *see also Patton*, 467 U.S. at 1036–38; *Williams v. Bagley*, 380 F.3d 932, 944 (6th Cir. 2004), *cert. denied*, __ S.Ct. __, 2005 WL 461247 (U.S. Apr. 25, 2005) (No. 04–8810); *DeLisle*, 161 F.3d at 382 (citing *Irvin*, 366 U.S. at 723, *Patton*, 467 U.S. at 1031, and *Mu'Min*, 500 U.S. at 428, the court stated "[o]ur standard of review in this *habeas* proceeding does not permit us to substitute our view of possible juror bias for the state court's view; we may overturn the state court's findings of juror impartiality if

25

those findings are manifestly erroneous") (emphasis in original).  Because such a determination is largely one of credibility, and thus demeanor, the finding of the trial court is entitled to "special deference."  *Patton,* 467 U.S. at 1038.

In this case, in ruling on petitioner's motion for change of venue filed prior to trial,  the Butler County Common Pleas Court initially determined that the extent and nature of the pretrial publicity was not so pervasive as to give rise to a presumption of prejudice as found in *Rideau, Estes*, and *Sheppard*.  (*See* Doc. 4, Ex. D, pp. 4-5).  The court went on to overrule the motion for change of venue at that time "subject to *voir dire* examination," because examination of the prospective jurors was necessary before any determination could be made about the existence of "actual prejudice."  (*Id.,* p. 5).

During the jury *voir dire*, the jury pool was questioned extensively at the outset of the proceedings about whether anyone had been exposed to pretrial publicity and, if so, the effect of such publicity on his or her ability to be fair and impartial in rendering judgment in the case.  (*See* Doc. 5, Tr. 6-24).  Out of the pool comprised of 70 to 75 people, approximately 25 persons responded that they had seen or heard about the case through pretrial publicity.  (*See id.* & Tr. 28).  Out of those 25 persons, only four individuals indicated that they were "tainted" or might not be able to set aside the information they had learned from the news and base their verdict solely on the evidence presented at trial.  (*Id.,* Tr. 11, 16, 21).  Those individuals, as well as other persons prejudicially affected by outside

26

influences in addition to pretrial publicity, were all removed from the jury pool at that point in the *voir dire* proceedings. (*See id.,* Tr. 39-41). It further appears from the record that only four of the jurors seated on the jury that decided petitioner's guilt on the murder charge were actually exposed to pretrial publicity. (*See id.,* Tr. 79-81, 88, 141-42, 147-48). Each of those jurors expressed in answer to questions posed to them individually by the court, the prosecuting attorney and defense counsel, that they could set aside what they had previously heard or read about the case and base their decision solely on the evidence presented at trial. (*See id.* Tr. 6-24, 79-81, 88, 141-42, 147-48).[5] During the *voir dire* proceedings, defense counsel renewed his motion for change of venue due to pretrial publicity, which the trial court decided to hold in abeyance until the conclusion of the *voir dire* examination of the prospective jurors. (*Id.,* Tr. 28, 50-51). Although it appears from the record that the trial court never expressly ruled on the motion, it also appears that by the close of the jury selection process,

---

[5]The Court is unable to determine exactly what was said by some of these jurors to the trial court during its examination of the jury pool on the pretrial publicity issue. (*See* Doc. 5, Tr. 6-24). However, the record does reflect that one of the jurors had read "a few articles about this case," and felt "very confident" that he could follow the judge's instruction to not "consider those things outside the courtroom." (Doc. 5, Tr. 79-80). A second juror affirmed that he had "heard a little bit about this case," but thought he could "forget about whatever [he] heard or read, and base [his] decision . . . solely on what's in the courtroom." (*Id.,* Tr. 80). A third juror said she saw something on the news about the case that morning for "about 10 seconds;" she further stated: "I had my hair dryer on so I didn't hear it all. All I saw was the clip on the bottom of the screen." (*Id.,* Tr. 81). Finally, a fourth juror stated to the trial court that he saw "something on television and maybe two or three articles," but that it had "been quite a while ago." (*Id.,* Tr. 19, 139). On further questioning by the prosecuting attorney and defense counsel, he stood by his earlier statement to the court that he could set what he had read and heard about the case aside, be fair and impartial and base his decision only on the evidence presented at trial. (*Id.,* Tr. 142, 148).

defense counsel was satisfied with the jurors who were ultimately selected to hear and decide the case.  (*See id.*, Tr. 177).

Upon review of the record, this Court agrees with the trial court's determination that this case does not fall into the rare class of cases where prejudice is presumed.  As the Sixth Circuit held in *Nevers, Rideau* is "not applicable to this case because *Rideau* is limited to its facts: a televised jail-house interrogation of a defendant, in which he confessed to a robbery/kidnapping/murder that he had committed only the previous night, seen by over one-third of the community's residents . . . less than two months before his trial." *Nevers*, 169 F.3d at 365; *accord DeLisle*, 161 F.3d at 384 (rejecting petitioner's claim that the non-televised dissemination of his confession created a presumption of prejudice under *Rideau*, because "it was only 'the *televising* of a defendant in the act of confessing to a crime' that the *Rideau* Court held 'was inherently invalid under the Due Process Clause of the Fourteenth Amendment'") (quoting *Estes*, 381 U.S. at 538) (emphasis added in *DeLisle*).   Moreover, the record does not even remotely suggest that petitioner's trial took place under "the conditions of total chaos that prevailed in *Estes* and *Sheppard*" and which "drove those decisions." *DeLisle*, 161 F.3d at 384–85; *accord Nevers*, 169 F.3d at 365–66.

28

Assuming, *arguendo,* as petitioner contends, that the press coverage of the case was extensive, the fact that there was extensive pretrial publicity is insufficient, standing alone, to justify a finding that petitioner's criminal trial was utterly corrupted by press coverage. *See Dobbert*, 432 U.S. at 301-03. Moreover, it appears upon review of the transcript of the *voir dire* proceedings, that the general public sentiment arising from the incident was not such that a mob-like, carnival or circus atmosphere existed with respect to petitioner's particular trial. Therefore, the facts do not suggest this case falls within the category of "extraordinary" or "utterly corrupting circumstances" for imputing partiality to jurors who explicitly and firmly stated they could try the case fairly and without a predisposition to convict. *Cf. DeLisle,* 161 F.3d at 386.

In addition, upon examination of the totality of circumstances, this Court concludes that petitioner has not demonstrated under the "actual prejudice" standard that he was denied a fair and impartial jury by the trial court's refusal to grant a change of venue. First, no showing has been made about the "nature" of the pretrial publicity claimed to have had a prejudicial effect on potential jurors. Moreover, most importantly, although the record reflects that a number of prospective jurors had read or heard something about the case, most of the jury pool was never exposed to any pretrial publicity. The handful of prospective jurors who indicated that pretrial publicity had prejudicially affected them were dismissed from the jury pool, while the remaining prospective jurors who had been exposed

29

to pretrial publicity all indicated they could render a decision based solely on the evidence presented at trial free of any influence from the media coverage of the case.  Finally, the four persons exposed to pretrial publicity who were ultimately selected to serve on the jury individually assured the trial court after extensive questioning by the court and both parties' counsel that they could decide the case impartially and fairly based upon the evidence.

Finally, upon review of the *voir dire* proceedings, this Court concludes that the procedure utilized by the trial court in conducting the *voir dire* on the subject of pretrial publicity met the "essential demands of fairness," *Morgan*, 504 U.S. at 729, and was adequate to provide the judge with sufficient information to make a determination as to whether or not the impact of such publicity rose to the level of "actual prejudice," *Ritchie*, 313 F.3d at 962.  The prospective jurors were all asked during the *voir dire* whether they had been exposed to pretrial publicity and whether the reports they had seen or heard could influence their decision about petitioner's guilt or innocence.  Without revealing the details of their specific knowledge of the case , the prospective jurors who indicated that they could not be fair and impartial as a result of their exposure to pretrial publicity were immediately dismissed from the jury pool.  Moreover, prospective jurors who indicated they saw certain media reports were individually questioned during the group *voir dire* as to their level of exposure and the effect of such exposure on their ability to decide the case fairly and impartially.  No details of these reports were discussed or otherwise brought out in this group questioning.

30

Accordingly, in sum, upon review of the *voir dire* proceedings, the Court concludes that petitioner has failed to demonstrate the existence of presumed or actual juror bias based on the pretrial publicity involved in this case, or that the *voir dire* was conducted in a manner that violated the due process guarantee of fundamental fairness. Therefore, petitioner is not entitled to relief based on his claim alleged in Ground Two that he was denied a fair and impartial jury trial by the trial court's refusal to grant a change of venue.

**C. Petitioner Is Not Entitled To Habeas Relief Based On His Third Ground Of Appellate Counsel Ineffective Assistance**

In Ground Three of the petition, petitioner alleges he was denied effective assistance of appellate counsel in violation of the Sixth Amendment based on his attorney's failure to raise the claims alleged in Grounds One and Two as assignments of error on direct appeal. (Doc. 1, ¶ 17).

To establish a Sixth Amendment violation under the applicable two-part standard enunciated by the Supreme Court in *Strickland v. Washington*, 466 U.S. 668 (1984), petitioner must demonstrate: (1) his attorney made such serious errors he was not functioning as the "counsel" guaranteed by the Sixth Amendment; and (2) his attorney's deficient performance prejudiced the defense by undermining the reliability of the appeal result. *See Strickland*, 466 U.S. at 687.

31

Under the first prong of the *Strickland* test, petitioner must demonstrate that his counsel's representation fell below an objective standard of reasonableness based on all the circumstances surrounding the case. *Id.* at 688. Judicial scrutiny of counsel's performance must be highly deferential, and a "fair assessment of attorney performance requires that every effort be made to eliminate the distorting effects of hindsight" and to evaluate the challenged conduct from counsel's perspective at the time of the conduct. *Id.* at 689. In determining whether or not counsel's performance was deficient, the Court must indulge a strong presumption that counsel's conduct fell within the wide range of reasonable professional assistance. *Id.*

To satisfy the second "prejudice" prong of the *Strickland* test, petitioner must show that a "reasonable probability" exists that, but for his counsel's errors, the result of the appeal proceedings would have been different. *Id.* at 694. Petitioner has met his burden if he shows that the result of his appeal would "reasonably likely have been different absent the errors." *Id.* at 695.

The Court need not examine the question of whether counsel's performance was deficient before addressing the question of whether petitioner was prejudiced by counsel's performance. The Court may dispose of an ineffective assistance of counsel claim by finding that petitioner has made an insufficient showing on either ground. *Id.* at 697.

32

In this case, the Court concludes that the representation provided by petitioner's appellate counsel was neither deficient within the meaning of the Sixth Amendment nor prejudicial to petitioner.

Specifically, under the first prong of the *Strickland* test, petitioner has not demonstrated that his appellate counsel's representation fell outside the wide range of reasonable professional assistance. *See Strickland*, 466 U.S. at 687. Petitioner's appellate counsel presented eight assignments of error on direct appeal, which he reasonably believed had the strongest chance of success. Appellate counsel does not have a constitutional duty "to raise every 'colorable' claim suggested by a client." *Jones v. Barnes*, 463 U.S. 745, 754 (1983). In *Barnes*, the Supreme Court stated:

> There can hardly be any question about the importance of having the appellate advocate examine the record with a view to selecting the most promising issues for review. . . . A brief that raises every colorable issue runs the risk of burying good arguments–those that, in the words of the great advocate John W. Davis, "go for the jugular," . . .–in a verbal mound made up of strong and weak contentions.

*Id.* at 752–53. The Supreme Court has more recently stated that "[n]otwithstanding *Barnes*, it is still possible to bring a *Strickland* claim based on counsel's failure to raise a particular claim, but it is difficult to demonstrate that counsel was incompetent." *Smith v. Robbins*, 528 U.S. 259, 288 (2000). Quoting from a Seventh Circuit decision, *Gray v. Greer,* 800 F.2d 644, 646 (7th Cir. 1986), the Supreme Court indicated that "[g]enerally, only when ignored issues are clearly stronger than those presented, will the presumption of effective assistance be overcome." *Id.* Here, counsel's focus on the strongest arguments for finding reversible trial error constituted effective appellate advocacy.

In any event, under the second prong of the *Strickland* test, it is not reasonably likely that the result of petitioner's appeal would have been different if the constitutional claims alleged in Grounds One and Two of the instant petition had been presented as assignments of error on direct appeal.  This Court has concluded that there is no merit to petitioner's claims for habeas corpus relief alleged in Grounds One and Two of the petition.  For the reasons given above by this Court in rejecting the two claims on the merits, *see supra* pp. 7–20, it is highly unlikely that the Ohio Court of Appeals would have reversed the trial court's judgment of conviction and sentence on the basis of either of those claims.

Accordingly, because petitioner has not shown as required under *Strickland* that his attorney provided ineffective assistance on direct appeal, he is not entitled to habeas relief based on his claim alleged in Ground Three of the petition challenging the effectiveness of his appellate counsel.

## IT IS THEREFORE RECOMMENDED THAT:

1. Petitioner's petition for writ of habeas corpus pursuant to 28 U.S.C. § 2254 (Doc. 1) be DENIED with prejudice.

2. A certificate of appealability should not issue with respect to any of petitioner's grounds for relief, which have been addressed on the merits herein, because petitioner has failed to make a substantial showing of the denial of a constitutional right based on these claims.[6] *See* 28 U.S.C. § 2253(c); Fed. R. App. P. 22(b).

3. With respect to any application by petitioner to proceed on appeal *in forma pauperis*, the Court should certify pursuant to 28 U.S.C. § 1915(a)(3) that an appeal of any Order adopting this Report and Recommendation would not be taken in "good faith," and therefore DENY petitioner leave to appeal *in forma pauperis* upon a showing of financial necessity.  *See* Fed. R. App. P. 24(a); *Kincade v. Sparkman*, 117 F.3d 949, 952 (6th Cir. 1997).

## CONCLUSION

Upon careful consideration of the petitioner's objections, and upon conducting a *de novo* review of the record, especially in light of petitioner's objections, the Court finds that petitioner's contentions have either been adequately addressed and properly disposed of by the Judge or present no particularized arguments that warrant specific responses by this Court.  The Court finds that the Judge has accurately set forth the controlling principles of law and properly applied them to the particular facts of this case and agrees with the Judge that petitioner's convictions are supported by sufficient evidence.

---

[6]Because this Court's adjudication of petitioner's three grounds for relief does not involve the denial or dismissal of such claims on procedural grounds, the two-part test enunciated in **Slack v. McDaniel**, 529 U.S. 473, 484-85 (2000), for determining whether or not to issue a certificate of appealability for procedurally-defaulted claims, is inapplicable.

- 35 -

Accordingly, the Court accepts the factual findings and legal reasoning of the Magistrate Judge and hereby **ADOPTS** his Report and Recommendation dated May 6, 2005.  The Petition for Writ of Habeas Corpus is, therefore, **DENIED WITH PREJUDICE** and this action is hereby **DISMISSED.**

A certificate of appealability will not issue with respect to any of petitioner's grounds for relief, which have been addressed on the merits herein, because petitioner has failed to make a substantial showing of the denial of a constitutional right based on these claims.[7]  *See* 28 U.S.C. § 2253(c); Fed. R. App. P. 22(b).

With respect to any application by petitioner to proceed on appeal *in forma pauperis*, the Court does certify pursuant to 28 U.S.C. § 1915(a)(3) that an appeal of any Order adopting this Report and Recommendation would not be taken in "good faith," and therefore DENY petitioner leave to appeal *in forma pauperis* upon a showing of financial necessity.  *See* Fed. R. App. P. 24(a); *Kincade v. Sparkman,* 117 F.3d 949, 952 (6th Cir. 1997).

**IT IS SO ORDERED.**

_____s/Herman J. Weber_____
Herman J. Weber, Senior Judge
United States District Court

---

[7]Because this Court's adjudication of petitioner's three grounds for relief does not involve the denial or dismissal of such claims on procedural grounds, the two-part test enunciated in **Slack v. McDaniel**, 529 U.S. 473, 484-85 (2000), for determining whether or not to issue a certificate of appealability for procedurally-defaulted claims, is inapplicable.